UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGINALD TANUBAGIJO, | No. 2:18-cv-02290-MCE-CKD P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| DANIEL PARAMO, | |
| Respondents. | |

     Petitioner is a state inmate proceeding pro se with a first amended federal habeas corpus application filed pursuant to 28 U.S.C. § 2254. ECF No. 27. Petitioner challenges his conviction following a jury trial in the Solano County Superior Court for second degree murder and assault of a child causing death. Petitioner was sentenced to 25 years to life in state prison. In his amended habeas application, petitioner contends that he was denied his right to an impartial and unbiased juror because "a mischievous juror… continue[d] using his cell phone [to send tweets] throughout [the] entire trial." ECF No. 27 at 5. Upon careful consideration of the record and the applicable law, the undersigned recommends denying petitioner's habeas corpus application for the reasons set forth below.

/////

/////

/////

I. **Factual and Procedural History**

A. **Jury Trial**

After independently reviewing the record, this court finds the state appellate court's summary of the evidence accurate and adopts it herein.[1]

> *Prosecution Evidence*
>
> C.B. was born in September 2010. Tanubagijo and his wife, Tammy, were C.B.'s foster parents.[] Before becoming a foster parent, Tanubagijo received training which included specific instructions not to shake a baby, and doing so "could cause brain injury, neck injury, physical damage" to the baby. At "well baby" checkups in September and November, C.B.'s pediatricians thought he was doing well and developing normally.
>
> On a November 2010 evening, Tanubagijo and Tammy had neighbors over to visit. C.B. seemed relaxed and happy. The neighbors fed and burped C.B.; nothing seemed out of the ordinary. After their friends left around 8:00 p.m., Tammy put C.B. in a "bouncer" seat on top of the table so Tanubagijo could feed him. Tammy left the kitchen. Three or four minutes later, Tanubagijo yelled Tammy's name. Tanubagijo approached Tammy, handed her the baby, and told her, "I think he's choking." C.B. was limp. Tammy took C.B. to the table, cleared his mouth, and started CPR. C.B. spit up. Tammy continued CPR and Tanubagijo called 911.
>
> Suisun Police Officer Andrew White received a call from dispatch and went to Tanubagijo and Tammy's home. Tanubagijo answered the door. Frantic, he told Officer White the baby "wasn't breathing and was choking on milk." The two men went to the kitchen, where C.B. was on the table, limp. Tammy was with the baby; she told Officer White he was choking on milk. C.B.'s eyes were rolling back in his head, a white substance was coming out of his mouth, and he was turning blue. Officer White began CPR. Shortly thereafter, paramedics arrived and brought C.B. to the hospital.
>
> When C.B. arrived at the emergency room, he was "floppy and unresponsive." The emergency room doctor noticed C.B.'s pupils were dilated and "not reactive[,]" and that he had "increased pressure in [his] head." A CT scan revealed "devastating" and "extensive" brain injury and "bleeding around the brain[.]" There was "a lot" of blood, which had collected in the front of C.B.'s brain and "moved all the way back into the posterior part of the head." According to the emergency room doctor, the bleeding was "acute," meaning it had "happened within a very short[,] very recent period of time."
>
> C.B. was transferred to Oakland Children's Hospital, where doctors

---

[1] See 28 U.S.C. § 2254(e)(1) (emphasizing that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts it by clear and convincing evidence).

2

determined he had a "severe brain injury" and that an operation would not improve his condition. A child abuse pediatrician reviewed the CT scan, which showed extensive bleeding between C.B.'s brain and skull. C.B.'s "entire brain . . . looked abnormal." An ophthalmologist and a retinal specialist observed "retinal hemorrhages that were so extensive . . . that no normal retina was left." Laboratory tests indicated no metabolic abnormality — such as a bleeding disorder — that would explain the hemorrhages. The child abuse pediatrician opined the hemorrhages and brain injury were "only consistent with abusive head trauma" such as a "violent" or "very severe traumatic shaking event, or a slamming event[.]" C.B.'s injuries were "not consistent with choking." Doctors determined C.B. would not regain consciousness; they removed him from life support and he died.

A medical examiner determined C.B. "succumbed to blunt head trauma, and the manner of death was a homicide." The medical examiner believed the hemorrhages in C.B.'s brain and eyes were produced when his brain was "rock[ed] back and forth" as he was "shaken" and then "potentially struck." C.B.'s injuries were not caused by a fall. The medical examiner explained: "[w]ith a fall if you have impact to the head, you would expect the injury to be localized to that particular place." C.B.'s injury "encompass[ed] the entire brain."

An ophthalmologist examined C.B.'s eyes after the autopsy was performed and discovered "hemorrhages in the retina all the way from the optic nerve from the back of the eye all the way out to where the retina ends[.]" The optic nerve in both of C.B.'s eyes was also swollen. According to the ophthalmologist, "[a]lmost every time you see that[,] it will be the shaken baby syndrome." The ophthalmologist determined C.B.'s hemorrhages were "due to rapid and repeated, not just one or two, but . . . rapid and repeated acceleration, deceleration forces."

Suisun police officers interviewed Tanubagijo twice. In the first interview, Tanubagijo said C.B. choked during a feeding. As Tanubagijo tried to burp C.B., his head "flop[p]ed" and Tanubagijo called for Tammy. In the second interview, however, Tanubagijo said C.B. fell from the bouncer to the floor, a distance of about three feet, and landed on his head.2 He denied shaking the baby.

2 The distance from the top of the dining room table to the floor was 30 inches, or two feet, six inches. The medical examiner testified a fall from a distance less than 36 inches would not explain C.B.'s hemorrhages. The ophthalmologist reached the same conclusion, noting, "I've never seen accidental trauma that causes this type of hemorrhage."

In early December 2010, Tanubagijo attempted suicide. Law enforcement officers found Tanubagijo in his backyard with bloody towels wrapped around his wrists. Inside the house, police officers discovered several letters, some of which stated: "'I killed [C.B.]. Tammy is innocent'" and "'Tell the Judge I did kill [C.B.]'"

3

1
*Defense Evidence*

2
A neuropathologist testified C.B.'s brain injuries could be consistent with an accidental fall. According to the neuropathologist, C.B. had a "preexisting" condition — "fluid collection with some blood in it over his brain." This preexisting condition, combined with a "fall with probable head impact," caused C.B.'s injuries. The pathologist who performed the autopsy testified C.B.'s injuries were consistent with falling from a bouncy seat off of a table.

Tanubagijo testified he was feeding C.B. when the bouncer seat "move[d] a little bit to the edge [of the table]. . . . [T]hen the bouncer fell down to the floor[,]" and landed on C.B. Tanubagijo tried to revive C.B., shaking him four to six times. He did not violently or angrily shake C.B., nor try to hurt the baby. Tanubagijo did not tell anyone C.B. fell off the table because he thought his wife would be angry with him and that he would "be in trouble[.]" He tried to kill himself because he was "ashamed" that he was "not a good father," and because in his culture, "if someone dies under [your] care," you should die. Several character witnesses testified Tanubagijo was a kind and gentle person, and a loving father.

ECF No. 40-12 at 97-99.

### B. Motion for a New Trial

The jury began its deliberations on July 24, 2014 and continued for two additional days on July 28 and 29, 2014. It reached a verdict on July 29, 2014 finding petitioner guilty of both charged offenses. See ECF No. 40-4 at 51-52 (Verdict Forms).

Prior to sentencing, petitioner moved for a new trial pursuant to California Penal Code § 1181(3) arguing that a juror committed misconduct by not being honest during voir dire about his ability to follow the presumption of innocence, prejudging the case before the People finished presenting their case, and communicating with non-jurors about the trial via Twitter. ECF No. 40-4 at 112-119. In a declaration attached to the motion, a defense investigator averred that he interviewed a juror who admitted posting tweets after being sworn as a juror. ECF No. 40-4 at 121-122. During the interview with the defense investigator, the juror admitted he "was aware that the . . . judge presiding over the trial had ordered all jurors, including himself, not to use any social media or post to social media concerning their jury service. He admitted that he had disregarded the court's admonition, qualifying his behavior by stating 'But I did not say anything about the facts of the case.'" ECF No. 40-4 at 122. The new trial motion attached 60 posts from the juror's Twitter account between July 8 and 28, 2014. ECF No. 40-4 at 126-187.

4

The California Court of Appeal characterized these tweets as follows:

> Many postings concerned quotidian matters such as the Juror's opinion on fashion and music. Some tweets, however, referred to jury duty: on July 8, the day before the jury was sworn, the Juror tweeted, "Are u kidding me? This jury duty shit is NOT for me dude." On July 14, toward the end of the People's case-in-chief, the Juror tweeted, "Jury duty lunch break." On July 22, on a day when no testimony was heard, he wrote, "Woke up early and knocked out the gym before jury duty bout to spark one, throw in a load of laundry, and tidy up the kitchen." On July 23, the last day of the defense case, the Juror tweeted, "Jury duty needs to be on its Ps & Qs today. I need to go get this phone together and the gym is calling me."
>
> On July 24, 2014, the prosecutor gave closing argument. During the lunch break, the Juror wrote, "I know this jury is not gonna want to deliberate with me while I have an attitude so they have about 2.2 to get this shit TOGETHER." On July 28, just before deliberations began, the Juror tweeted, "Deliberation starts today. I wish I could record it cuz this shit is about to be crazy lol" and "In a room with 11 other strongly opinionated people trying to all agree on a verdict? yea right." The new trial motion, however, was premised almost entirely on the following tweet from July 16, the last day of the prosecution's case-in-chief: "In my book, everybody's guilty until proven innocent. And by the looks of it, both of you niggas are facing life."

ECF No. 40-12 at 107-108.

At an evidentiary hearing on petitioner's motion for a new trial, the juror was sworn as a witness and examined by the trial judge. ECF No. 40-11 at 7-11 (Augmented Reporter's Transcript). The trial judge then explained that:

> "I've had you brought in and sworn in because I need to -- I need to ask you some questions. My recollection is you were a juror in a case here…. You sat right where that DA is sitting for our trial, which lasted a few weeks.
>
> The defense has filed a motion requesting a new trial alleging that you have committed something called juror misconduct. And so -- what they've done is they've submitted a declaration from an investigator… who said that… he interviewed you, you talked about your Twitter account, and he said that you had posted lots of – well, I'm going to read you what he said…."

ECF No. 40-11 at 8. After the juror confirmed the accuracy of the information provided in the defense investigator's affidavit, the following colloquy ensued between the trial judge and the juror:

> THE COURT: So I do agree with you, that you did not say anything

5

about the facts of the case from all of the Twitter that I've seen. But there is one -- how old are you?

[THE JUROR]: I'm 24.

THE COURT: There is one actual tweet that concerns me, and let me find it.

It's a Tweet that was-- and I'm not sure if this is the actual time and date, but it lists a tweet on July 16th of 2014 at 11:12 a.m. And I'm going to let you read it first, and then I'm going to read it into the record.

[THE JUROR]: Yeah.

THE COURT: So -- and that one is, quote, 'In my book, everyone's guilty until proven innocent. And by the looks of it, both you niggas are facing life.

So when I read that, my first thought was perhaps you were talking about some other case, because my recollection was there was only one defendant in this case.

[THE JUROR]: Correct.

THE COURT: So what can you tell me about this tweet? Does it have anything to do with this case?

[THE JUROR]: Not at all, sir.

THE COURT: What does it have to do with?

[THE JUROR]: It's a subliminal message to my significant other, at the time, of a friend of mine.

THE COURT: Okay. Thank you.

Now I want to break it down.

So you're talking about something else?

[THE JUROR]: Uh-huh.

THE COURT: But what also concerns me is this -- I'm going to talk about the first sentence.

All right?

[THE JUROR]: Uh-huh.

THE COURT: Let me show it to you, so you know what we're talking about.

The first sentence says, 'In my book, everyone is guilty until proven innocent.' And I remember in this case -- well, in most cases,

6

actually, all of these ones that I do, that I start the case in the voir dire. I talk about how everyone's cloaked in the presumption of innocence, and the People have to prove someone's guilty beyond a reasonable doubt. Otherwise, they get a not guilty. And I think all of the jurors agreed to do that, and -- so did you in -- did you follow my instructions in this case? Did you keep an open mind in this case?

[THE JUROR]: I did, sir.

THE COURT: Did you wait until all of [the] evidence was in, and I instructed you before you -- did you deliberate with 11 other people back there?

[THE JUROR]: Yes, I did.

THE COURT: And did you all discuss the case and decide the case based on the evidence?

[THE JUROR]: Yes, sir.

THE COURT: Did you – did you pre-judge Mr. Tanubagijo at all?

[THE JUROR]: No, sir.

THE COURT: All right. All right.

Thank you, sir. Again, I tell jurors not to do this stuff to protect them.

[THE JUROR]: Absolutely.

THE COURT: Not for any other reason. Because people will go and – in this day and age in social media, you'll now find yourself the subject of this investigating, having to come to court and all the rest of it. Obviously, an innocent explanation, but it causes you to have to take time out of your day to come here and deal with all these issues.

Thank you for coming today. You're excused.

ECF No. 40-11 at 9-11.

Based on this evidence, the trial court found that the juror "violated the Court's orders not to tweet and comment about the case." ECF No. 40-11 at 14. However, "in the totality of everything that we have here… I don't think it establishes misconduct." Id. at 15. Additionally, the trial court concluded that none of the juror's actions "reache[d] a level of prejudice that require[d] a new trial." Id. at 16.

**C. Direct Appeal**

Following his sentencing, petitioner filed a direct appeal. On February 9, 2017, the

7

California Court of Appeal affirmed petitioner's conviction and concluded that while the juror engaged in misconduct, it was not prejudicial. See ECF No. 40-12 (direct appeal opinion). Specifically, the Court of Appeal determined that the "Juror committed misconduct by violating the court's instructions not to share information about the case on social media." ECF No. 40-12 at 112. The appellate court deferred to the trial court's "implicit determination that the Juror was credible when he explained the tweet and his deliberations." Id. at 113. The Court of Appeal concluded that "[t]he Juror's testimony on the burden of proof actually applied by the Juror satisfied the court that, despite the tweet, the Juror followed the law. Moreover, there is no evidence other jurors read the Juror's tweets or that the tweets influenced the jury's deliberations." Id. at 113. As a result, petitioner's motion for a new trial was properly denied.

The California Supreme Court denied review on April 26, 2017. ECF No. 14-12 at 154.

**D. Federal Habeas Application**

In his first amended § 2254 application, petitioner asserts that the trial court erred by conducting an inadequate inquiry into the juror misconduct. ECF No. 27 at 5. Petitioner contends that he was denied his right to an impartial and unbiased juror because "a mischievous juror… continue[d] using his cell phone [to Tweet] throughout [the] entire trial." ECF No. 27 at 5.

According to respondent, the California Court of Appeal's decision that the juror misconduct was not prejudicial was a reasonable application of clearly established federal law. ECF No. 40-1 at 7-17. The trial court was restrained from asking "whether the belief expressed in the tweet, …in any way influenced his thinking or conduct while serving as a juror" because it would have pierced the veil of the jury's deliberative process which is prohibited by both state and federal rules of evidence. ECF No. 40-1 at 15; see also Fed. R. Evid. 606(b); Cal. Evid. Code § 1150(a). As a result, the trial court's inquiry was sufficient to conclude that the juror's misconduct did not prejudice petitioner. Moreover, petitioner has not presented any evidence to rebut the presumption of correctness that applies to the state court's finding that the juror was not biased against petitioner. ECF No. 40-1 at 16 (citing 28 U.S.C. § 2254(e)(1)).

/////

## II. Legal Standards

### A. AEDPA Standard

To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that the state court decision resolving the claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000) ] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Clearly established federal law also includes "the legal principles and standards flowing from precedent." Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)). Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding

what law is "clearly established" and what constitutes "unreasonable application" of that law. Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

Relief is also available under the AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. See also Cullen v. Pinholster, 563 U.S. 170 (2011). Under § 2254(d)(2), factual findings of a state court are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

If petitioner meets either of the 28 U.S.C. § 2254(d) standards, then the federal habeas court reviews the merits of the constitutional claim under pre-AEDPA standards in order to be entitled to relief. Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc). While there is no required order in which these two inquiries must be conducted, federal habeas courts generally apply Section 2254(d) analysis first because it is a high hurdle for petitioners to overcome.

In applying these standards, federal courts review the last reasoned state court decision on each claim for relief. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst, 501 U.S. at 803; see also Gill v. Ayers, 342 F.3d 911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look through" unexplained rulings of higher state courts to the last reasoned decision).

**B.  Juror Misconduct Standard**

The Sixth Amendment guarantees a fair trial by a panel of impartial jurors to the accused.

10

U.S. Const. amend. VI. "[T]the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." Irvin v Dowd, 366 U.S. 717, 722 (1961). However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982). Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id.

When allegations of juror misconduct or bias arise, the trial court must determine the circumstances, the impact on the jurors, and whether the conduct was prejudicial. Remmer v. United States, 347 U.S. 227, 229–30 (1954). Ultimately, juror bias is a question of historical fact. The question of bias turns on what the juror said and did and whether the juror's statement that he or she could be impartial was credible. Patton v. Yount, 467 U.S. 1025, 1036 (1984).

Juror misconduct claims not rising to the level of actual or implied juror bias are reviewed for harmless error. See Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)); see also Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (determining that the Brecht harmless error standard applies on federal habeas). However, the presence of a biased juror is a structural error entitling defendant to a new trial. See Dyer v. Calderon, 151 F.3d 970, 973 n. 2 (9th Cir. 1998) (en banc).

**III. Analysis**

In light of his pro se status, this court liberally construes petitioner's challenge to the adequacy of the trial court's examination of the juror as a request to review the state court judgment to determine whether it was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court will conduct its analysis of each section of 28 U.S.C. § 2254(d) separately.

**A. 28 U.S.C. § 2254(d)(1)**

In this case, the last reasoned state court decision denying petitioner's juror misconduct claim is the California Court of Appeal decision. The state court concluded that the evidentiary hearing conducted by the trial court was sufficient, the juror's actions in tweeting during the trial

11

1 constituted misconduct, but that they were not prejudicial to petitioner because the most
2 inflammatory tweet "had no relation to the issues in the case and did not impair the juror's duty to
3 serve impartially." ECF No. 40-12 at 113. The California Court of Appeal concluded that the
4 majority of the juror's tweets were "quotidian aspects of jury service." ECF No. 40-12 at 113.

5       In this case, there is no dispute that juror misconduct occurred. The last reasoned state
6 court opinion in this case acknowledged the juror's defiance of court instructions resulting in
7 improper tweets made during the course of the trial. See ECF No. 40-12 at 112; see also ECF No.
8 40-4 at 62 (jury instruction on "Cautionary Admonitions: Jury conduct"). The only issue is
9 whether the state court's determination that such misconduct was not prejudicial was contrary to
10 or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

11       Although petitioner does not point to any specific Supreme Court case which the state
12 court misapplied in his case, the court's research has located only one comparable case involving
13 a juror's comments made on his personal blog during the course of a state criminal trial. Goupil
14 v. Cattell, Civil No. 07-cv-58-SM, 2008 WL 544863 (D. N.H. Feb. 26, 2008) (denying habeas
15 corpus relief based on juror's comments on his blog about jury service that were posted during
16 the course of trial but not seen by any other members of the jury). Just as in this case, the juror's
17 blogs referenced his impending jury duty. Goupil, 2008 WL 544863 at * 2. Most troublesome,
18 the juror indicated that he "get[s] to listen to local riff-raff try and convince me of their
19 innocence." Id. The trial court conducted a post-trial hearing on the juror misconduct and voir
20 dired each juror individually as well as the alternates. When questioned about his blog
21 comments, the juror "(1) denied being exposed to any press coverage regarding this case prior to
22 being drawn as a juror; (2) stated that no one responded to his postings on the web log that related
23 to his jury service on this or any other case; (3) denied receiving any responses to his blog; (4)
24 denied being contacted by anyone trying to influence his decision as a juror; (5) stated that
25 nothing interfered with his ability to follow the jury instructions with respect to the law of the
26 case; and (6) stated that he was absolutely able to make a fair and impartial verdict based upon his
27 evaluation of the evidence in the case as applied to the law given by the trial court." Id. at * 3.
28 The trial court in Goupil found that the juror's statements about his blog were credible and that

the entire jury understood the burden of proof and followed the trial court's instructions. Id. at *4. On direct appeal, the state supreme court concluded that the blog was not presumptively prejudicial and that, as a result, Goupil had the burden of demonstrating that those comments adversely affected his right to a fair and impartial jury. Id. The federal habeas court determined that relief was not warranted because the state court had conducted a full post-trial hearing and there was no evidence that the challenged juror lied during this hearing. As a result, the state court decision rejecting the juror misconduct claim was neither contrary to nor an unreasonable application of clearly established federal law or an unreasonable factual determination. Id. at *9-10; see also 28 U.S.C. § 2254(d).

Just as in Goupil, the state court's rejection of the juror misconduct claim was consistent with clearly established federal law. See Remmer v. United States, 347 U.S. 227 (1954). The trial court conducted a post-trial hearing to determine the circumstances surrounding the juror's tweets and whether they were prejudicial to petitioner. There was no evidence of actual, or even implied, bias since the most troublesome tweet did not concern petitioner's trial and the juror followed the trial court's instructions. Therefore, harmless error review was properly applied by the state court in this case.

Having determined that the state court opinion was not contrary to any Supreme Court case law, the court must still review whether it unreasonably applied existing precedent. See 28 U.S.C. § 2254(d)(1). In this case, there is no evidence that the juror concealed any information or lied in response to the trial court's inquiry. Compare Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998) (en banc). In Dyer, the Ninth Circuit found implied bias where the juror "chose to conceal a very major crime – the killing of her brother in a way that she knew was very similar to the way [the petitioner] was accused of killing his victims." Id. at 982. In this case, the lack of any concealment by the juror combined with the deference due to the trial court's implicit credibility determination relied upon by the California Court of Appeal, renders habeas relief unavailable under 28 U.S.C. § 2254(d)(1). See Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (holding that federal habeas courts pursuant to 28 U.S.C. § 2254(d) have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). The

state court's decision that the juror's misconduct was not prejudicial is a reasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1); see also Godoy v. Spearman, 861 F.3d 956, 967 (9th Cir. 2017) (en banc) (stating that "[w]e recognize the practical impossibility of shielding jurors from all contact with the outside world, and also that not all such contacts risk influencing the verdict."). Therefore, petitioner is not entitled to relief on his juror misconduct claim under 28 U.S.C. § 2254(d)(1).

### B. 28 U.S.C. § 2254(d)(2)

In order to conclude that the state court fact-finding process was defective in some material way, the reviewing federal habeas court "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004). So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness. See Tinsley v. Borg, 895 F.2d 520, 524-25 (9th Cir. 1990).

In this case, the trial court conducted a full hearing on the allegations of juror misconduct where the troublesome tweets were asked about individually. At first blush, that appears to satisfy constitutional standards. However, after reviewing the evidentiary hearing transcript in conjunction with the actual tweets, two additional observations are necessary about the state court's fact-finding process. First and foremost, all the voir dire of the Juror was conducted by the trial judge. See California v. Keenan, 46 Cal.3d 478, 539 (1988) (emphasizing that the trial court has broad discretion in determining how to investigate allegations of juror misconduct). Specifically, when asking about the most troublesome tweet involving the burden of proof and a racial slur, the trial judge first commented that "my first thought was perhaps you were talking about some other case…." The juror then stated that his tweet did not have anything to do with petitioner's case. ECF No. 40-11 at 10. Secondly, after the juror was excused from the courtroom, defense counsel did point out another tweet about the juror's use of drugs. ECF No. 40-11 at 12. The trial court responded that it "may or may not mean that," but no further voir dire of the juror was conducted on this subject. See ECF No. 40-4 at 157-58, 176, 179, 183 (tweets

14

containing drug references).[2]

Even with these considerations in mind, the undersigned cannot conclude that this rendered the entire evidentiary hearing defective in some material way for two reasons. Despite the leading nature of the questions during the evidentiary hearing, the California Court of Appeal found the juror's responses to be credible. Petitioner has not submitted any evidence, nor even argument, that casts doubt on this state court credibility determination. See Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (finding credibility determination of a witness who was seen and observed by a state trial court is not susceptible to contrary conclusion by a federal habeas court). Moreover, the evidentiary hearing transcript reveals that the Solano County Sheriff's Department took the jurors' phones away while they were deliberating. ECF No. 40-11 at 13. So there is no evidence that could possibly be produced that the juror in this case was tweeting while deliberating or that any of the remaining jurors read his tweets. In light of the record as a whole, the undersigned has no basis for finding that the California courts' rejection of this claim was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d)(2); compare Lawson v. Borg, 60 F.3d 608 (9th Cir. 1995) (finding pursuant to § 2254(d)(2) that the state court did not conduct a full and fair hearing on the juror misconduct claim when the issue was resolved based on contradictory affidavits alone). Therefore, petitioner is not entitled to habeas corpus relief.

IV.     **Plain Language Summary for Pro Se Party**

The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed your habeas corpus application and the trial court record in your case. The undersigned is recommending that your habeas petition be denied on the merits.

If you disagree with this result, you have 14 days to explain why it is incorrect. Label your explanation "Objections to Magistrate Judge's Findings and Recommendations." The district court judge assigned to your case will then review the entire record and make the final

---

[2] Based on the date and times of these tweets, they were made after court had adjourned for the day or when the trial court was not in session.

decision in your case.

## V. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's first amended application for a writ of habeas corpus (ECF No. 27) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  January 30, 2023

_CAROLYN K. DELANEY_
UNITED STATES MAGISTRATE JUDGE

12/tanu2290.F&R.merits.docx

16